CHANEY CALDWELL and others *v.* WILLIAM J. WATSON and others.

Whenever it shall judicially appear that any person while held as a slave, purchased and paid for any property, real or personal, and that conveyance thereof was made to him, or to any one for his use, such purchaser, or those lawfully representing him, shall be entitled to such property, anything in the former laws of this State forbidding slaves to acquire and hold property, to the contrary notwithstanding.

A, a slave, purchased in 1858, a lot of B, paying therefor, which was conveyed to C, to have and to hold so long as the said A shall live, with remainder to the children of D, A's owner—this being done in fraud of the law—and in 1869, after A had become a free man, B executes and delivers another deed to A himself, in fee simple, being in possession and continuing in possession until his death in 1872. Before his death, A devised the lot to the plaintiff, his wife, with remainder to his grandchildren. In an action by the plaintiff, demanding that the first deed from B to C shall be delivered up to be cancelled and declared void, and the cloud upon her title removed: *It was held,* that the plaintiff was clearly entitled to the relief sought, A, the grantee in the second deed, being owner in fee, with the right to devise the same.

(*Lattimore* v. *Dixon,* 63 N. C. Rep. 356, cited and approved.)

This was a CIVIL ACTION tried before his Honor, Judge *Kerr,* at Fall Term, 1875, of Orange Superior Court.

The parties having waived a trial by jury ; the court found the following facts:

That November Caldwell was in the year 1858, a slave, the property of Dr. William Hooper, and upon the removal of Dr. Hooper from Chapel Hill, wishing to remain there, he made arrangements with James Y. Watson, by which the latter was to purchase him at the price of three hundred dollars, and he, November, was to pay the purchase money ; which he accordingly did.

That about the same time, November being the slave of Jas. Y. Watson, bought of one Green Caudle a lot of land, which

is the subject of this controversy, at the price of one hundred dollars, and himself paid the whole of the purchase money.

That November Caldwell took a deed dated the 10th day of September, 1858, whereby the said lot was conveyed by Green Caudle to one Jones Watson "to have and to hold to the said Jones Watson, so long as November, a slave formerly the property of Joseph Caldwell and now belonging to James Y. Watson, of Chapel Hill, shall live, with remainder upon his death to William J. Watson and Mary V. Watson, and their heirs, the said William and Mary being children of James Y. Watson aforesaid," this being done by the parties in fraud of the law. Neither Jones Watson, James Y. Watson or the remaindermen paid any part of the purchase money.

November Caldwell occupied the said lot from the date of his purchase to the day of his death on the 24th day of Dec. 1872, paid the taxes and built improvements thereon. On the 29th day of March, 1869, Green Caudle executed another deed for the lot, whereby he conveyed the same to November Caldwell in fee simple.

That November Caldwell left a last will and testament duly executed to pass both real and personal estate, which has been admitted to probate in the Probate Court of Orange county, wherein he devised the lot in controversy to the plaintiff, Chaney Caldwell, his wife, remainder in fee to the other plaintiffs, his grand children.

Upon these facts the court rendered judgment to the effect, that the plaintiffs take nothing, and that the defendants are entitled to the real estate mentioned in the complaint, and that a writ of possession issue to put them in possession thereof.

From this judgment the plaintiffs appealed and assigned the following as error :

1. That upon the finding of the court, the plaintiffs are entitled to have the deed from Caudle to Jones Watson cancelled by reason of the change of circumstances of the said Novem-

ber Caldwell and to have their title quieted by said cancellation.

2. That by the proper construction of said deed the estate given to Jones Watson terminated upon the death of November Caldwell, and the remainder, to William J. and Mary V. Watson, fails both for want of consideration moving from them, and because they are not parties to the said deed.

3. That said deed having been executed by a slave, in favor of his master's children, the law presumes undue influence and nothing else appearing, it should be vacated and the plaintiffs' title quieted by a cancellation thereof.

4. That at most, the said remaindermen had but an estate during the life of Jones Watson, and the court should have so declared, and thereby quieted the title of the plaintiffs acquired under the later deed from Green Caudle to November Caldwell, and will of the said November.

5. That the plaintiffs are entitled to recover of the defendants the costs of this action.

All other facts pertinent to the points decided, are stated in the opinion of the court.

*Graham & Ruffin*, for the appellants.
No counsel *contra*, in this court.

SETTLE, J.   The counsel for the plaintiffs suggests that if the court can find in the books no principle sufficiently large to give relief in cases like this, they ought to invent one to meet the new order of things necessarily arising upon the abolition of slavery and the establishment of freedom.   I confess that I should feel much inclined to do, rather than burden the consciences of the defendants with a decree in their favor. But fortunately for their repose, we need not invent a new principle in order to induce the defendants to do equity.   So far as this litigation is concerned, we may treat the defendants as plaintiffs seeking the active intervention of the court

to enable them, not to hold, but to recover possession of land by virtue of a deed which his Honor finds was made in fraud of the law.

His Honor also finds that neither Jones Watson, the trustee, nor James Y- Watson, the master, nor his children, the plaintiffs, ever paid any part of the purchase money, but that the same was paid by November Caldwell, who occupied the said lot from the date of his purchase in 1858, to the day of his death in 1872, and paid the taxes on the same and built improvements thereon ; and that he devised the same to his wife and grand children, who now have possession of the premises. So in order to support the decree which his Honor felt bound to render, we must give force to a deed made in fraud of the law, when equity would at least say to the parties, we leave you as we find you ; the devisees of November Caldwell in possession, and the aid of the court to eject them therefrom will not be granted.

But we must not stop here. Putting aside the fraudulent deed as something which the court will not enforce in aid of either party, it appears that Green Caudle, the grantor in the deed, on the 23d day of March, 1869, after November Caldwell had become a free man, executed another deed untainted with fraud in law or fact, and in pursuance of the original intention of all the parties, whereby he conveyed the same lot to November Caldwell in fee simple. So that November Caldwell having acquired his freedom, and being relieved of the disability which enforced his participation in the fraudulent transaction, acquires a deed in fee simple, to land for which he had paid the full purchase money to the vendor.

And now his devisees only ask the aid of the court to remove from their title, under the deed of 1869 a cloud darkened by fraud, and bearing upon the plaintiffs in a manner revolting to good conscience. Why cannot this be done without resort to a new principle ? But further, no one can believe for a

moment, that when November Caldwell, a slave, purchased his *quasi* freedom, and then purchased half an acre of land and paid for both with his own money, that either he or any of those with whom he was dealing, did not intend by the by the first deed to create a trust for his benefit, and that the limitation over to his master's children was also intended to be upon the same trust, from which they were to derive no beneficial interest. Will they at this day, be heard to say ought to the contrary ?

Whatever may have been the result, had the trustee or the masters children, in violation of all faith, taken the property to their own use, while November was a slave, and when such conveyances were against the policy of the law, yet as no such claim was asserted until that policy had ceased, and the Convention of 1868 had ordained, " that whenever it shall judicially appear that any person, while held as a slave, purchased and paid for any property, personal or real, and that conveyance thereof was made to him, or to any one for his use. such purchaser, or those lawfully representing him, shall be entitled to such property, anything in the former laws of the State forbidding slaves to acquire or hold property to the contrary, notwithstanding," it is clear that the courts will not now give countenance to such an iniquitous claim. Nor shall they permit the plaintiffs to be harassed thereby. In support of this view, we may cite the act of 1869–'70, chap. 57, to show that the Legislature has adopted the policy indicated by the Convention of 1868, a policy in fact, which necessarily sprang into existence, full grown and vigorous, upon the abolition of slavery.

The judgment of the Superior Court is reversed.

Let a decree be drawn in conformity with the prayer of the complaint. *Lattimore* v. *Dixon*, 63 N. C., 356.


PER CURIAM.                                    Judgment reversed.